## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BRYAN SIEGAL, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> KCG HOLDINGS, INC., CHARLES HALDEMAN, DEBRA CHRAPATY, DANIEL COLEMAN, PETER R. FISHER, RENE M. KERN, JAMES T. MILDE, JOHN MORRIS, ALASTAIR RAMPELL, DANIEL F. SCHMITT, LAURIE M. SHAHON, COLIN SMITH, HEATHER E. TOOKES, and ADRIAN WELLER, <br><br> Defendants. | Case No.: 1:17-cv-3886 <br><br> **CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff Bryan Siegal ("Plaintiff"), by his undersigned attorneys, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

### NATURE OF THE ACTION

1. This action is brought as a class action by Plaintiff on behalf of himself and the other public holders of the common stock of KCG Holdings, Inc. ("KCG" or the "Company") against the Company and the members of the Company's board of directors (collectively, the "Board" or "Individual Defendants," and, together with KCG, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), SEC Rule 14a-9, 17 C.F.R. 240.14a-9, and Regulation G, 17 C.F.R. § 244.100, in connection with the proposed merger (the "Proposed Merger") between KCG, Virtu Financial, Inc. ("Parent"), and Orchestra Merger Sub, Inc. ("Merger Sub," and together with Parent, "Virtu")

2.      On April 20, 2017, the Board caused the Company to enter into an agreement and plan of merger ("Merger Agreement"), pursuant to which the Company's shareholders stand to receive $20.00 in cash for each share of KCG common stock they own (the "Merger Consideration").

3.      On May 11, 2017, in order to convince KCG shareholders to vote in favor of the Proposed Merger, the Board authorized the filing of a materially incomplete and misleading Definitive Proxy Statement (the "Proxy") with the Securities and Exchange Commission ("SEC"), in violation of Sections 14(a) and 20(a) of the Exchange Act.

4.      While Defendants are touting the fairness of the Merger Consideration to the Company's shareholders in the Proxy, they have failed to disclose certain material information that is necessary for shareholders to properly assess the fairness of the Proposed Merger, thereby rendering certain statements in the Proxy incomplete and misleading.

5.      In particular, the Proxy contains materially incomplete and misleading information concerning: (i) financial projections for the Company; (ii) the valuation analyses performed by the Company's financial advisor, Goldman Sachs & Co. LLC ("Goldman"), in support of its fairness opinion; and (iii) a significant conflict of interest Goldman faced as a result of its sizeable holdings in Virtu.

6.      The special meeting of KCG shareholders to vote on the Proposed Merger is forthcoming.  It is imperative that the material information that has been omitted from the Proxy is disclosed to the Company's shareholders prior to the shareholder vote, so that they can properly exercise their corporate suffrage rights.

7.      For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act, and Rule 14a-9 and

Regulation G, 17 C.F.R. § 244.100.   Plaintiff seeks to enjoin Defendants from holding the shareholder vote on the Proposed Merger and taking any steps to consummate the Proposed Merger unless and until the material information discussed below is disclosed to KCG shareholders sufficiently in advance of the vote on the Proposed Merger or, in the event the Proposed Merger is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Section 14(a) and 20(a) of the Exchange Act.

9.      Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

10.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because: (i) the conduct at issue took place and had an effect in this District; (ii) KCG maintains its primary place of business in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

11.     Plaintiff is, and at all relevant times has been, a KCG shareholder.

12.     Defendant KCG is a Delaware company and maintains its headquarters at 300 Vesey Street, New York, New York 10282.  KCG is a leading independent securities firm offering clients a range of services designed to address trading needs across asset classes, product types and time zones. The Company combines advanced technology with specialized client service across market making, agency execution and trading venues and also engages in principal trading via exchange-based electronic market making. The Company has multiple access points to trade global equities, options, fixed income, currencies and commodities via voice or automated execution. KCG's common stock is traded on the NYSE under the ticker symbol "KCG".

13.     Individual Defendant Charles Haldeman ("Haldeman") is a director of KCG and is Chairman of the Board.

14.     Individual Defendant Daniel Coleman ("Coleman") is a director of KCG and the Chief Executive Officer ("CEO") of the Company.

15.     Individual Defendant Debra Chrapaty ("Chrapaty") is, and has been at all relevant times, a director of the Company.

16.     Individual Defendant Peter R. Fisher ("Fisher") is, and has been at all relevant times, a director of the Company.

17.     Individual Defendant Rene M. Kern ("Kern") is, and has been at all relevant times, a director of the Company.

18.     Individual Defendant James M. Milde ("Milde") is, and has been at all relevant times, a director of the Company.

19.      Individual Defendant John C. Morris ("Morris") is, and has been at all relevant times, a director of the Company.

20.      Individual Defendant Alastair Rampell ("Rampell") is, and has been at all relevant times, a director of the Company.

21.      Individual Defendant Daniel F. Schmitt ("Schmitt") is, and has been at all relevant times, a director of the Company.

22.      Individual Defendant Laurie M. Shahon ("Shahon") is, and has been at all relevant times, a director of the Company.

23.      Individual Defendant Colin Smith ("Smith") is, and has been at all relevant times, a director of the Company.

24.      Individual Defendant Heather E. Tookes ("Tookes") is, and has been at all relevant times, a director of the Company.

25.      Individual Defendant Adrian Weller ("Weller") is, and has been at all relevant times, a director of the Company.

26.      All parties identified in paragraphs 13 through 25 are collectively referred to herein as the "Individual Defendants."

## CLASS ACTION ALLEGATIONS

27.      Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other public shareholders of KCG (the "Class").  Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

28.      This action is properly maintainable as a class action because:

        a.      The Class is so numerous that joinder of all members is impracticable.  As

of April 17, 2017, there were approximately 66,680,421 shares of KCG common stock outstanding, held by hundreds to thousands of individuals and entities scattered throughout the country.  The actual number of public shareholders of KCG will be ascertained through discovery;

b.      There are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

i)      whether Defendants have misrepresented or omitted material information concerning the Proposed Merger in the Proxy in violation of Section 14(a) of the Exchange Act;

ii)     whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

iii)    whether Plaintiff and other members of the Class will suffer irreparable harm if compelled to vote their shares regarding the Proposed Merger based on the materially incomplete and misleading Proxy.

c.      Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

d.      Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

e.      The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual

members of the Class, which would establish incompatible standards of conduct for the party opposing the Class;

       f.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

       g.     A class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## <u>SUBSTANTIVE ALLEGATIONS</u>

**I.**    **Background**

29.    KCG incorporated on December 26, 2012, is a securities firm. The Company offers a range of services designed to address trading needs across asset classes, product types and time zones. The Company operates through three segments: Market Making, Global Execution Services and Corporate and Other. It combines technology with client service across market making, agency execution and trading venues and also engages in principal trading through exchange-based electronic market making. It has multiple access points to trade global equities, options, fixed income, currencies and commodities through voice or automated execution.

30.    On January 19, 2017, KCG issued a press release wherein it reported its financial results for the fourth quarter of 2016. The Company reported that total revenues were $580.5 million, compared to $208.5 million in the third quarter of 2016 and $264 million in the fourth quarter of 2015. Pre-tax earnings were $309.87 million, compared to a loss of $27.97 million in the third quarter of 2016 and a loss of $4.47 million in the fourth quarter of 2015. Earnings per share were $2.47 compared to ($0.13) in the third quarter of 2016 and ($0.03) in the fourth quarter of 2015. For its Market Making segment, the Company reported that total revenues were $168.3

million, compared to $136.1 million in the third quarter of 2016 and $168.2 million in the fourth quarter of 2015. For the Global Execution Services segment, the Company reported that total revenues were $75.5 million, compared to $63.7 million in the third quarter of 2016 and $70.2 million in the fourth quarter of 2015.  For the Corporate and Other segment, the Company reported that total revenues were $336.7 million, compared to $8.7 million in the third quarter of 2016 and $25.6 million in the fourth quarter of 2015. With respect to the results, Individual Defendant Coleman stated that "KCG's long-term growth is aligned with profound, secular changes in technology, regulation and competition. We are concentrating on attaining scale to enable us to grow without creating significant costs."

31.     Nevertheless, the Individual Defendants caused the Company to enter into the Merger Agreement, pursuant to which the Company will be acquired for inadequate consideration.

32.     The Individual Defendants have all but ensured that another entity will not emerge with a competing proposal by agreeing to a "no solicitation" provision in the Merger Agreement that prohibits the Individual Defendants from soliciting alternative proposals and severely constrains their ability to communicate and negotiate with potential buyers who wish to submit or have submitted unsolicited alternative proposals. Section 7.4(a) of the Merger Agreement states:

>  (a) Except as otherwise contemplated by this Section 7.4, the Company shall not, and shall use reasonable best efforts to cause its Affiliates or any of its or their respective officers, directors or employees, agents, affiliates and representatives (including any investment bankers, attorneys or accountants retained by it or any of its Affiliates) (collectively, "Representatives") not to, directly or indirectly, solicit or initiate, or knowingly encourage, induce or facilitate (including by way of providing information) any Company Takeover Proposal or any inquiry or proposal that constitutes or may reasonably be expected to result in a Company Takeover Proposal, (ii) participate in any discussions or negotiations with any Person regarding, or furnish to any Person any information with respect to, or cooperate in any way with any Person (whether or not a Person making a Company Takeover Proposal) with respect to any Company Takeover Proposal or any inquiry or proposal that may reasonably be expected to result in a Company Takeover Proposal, (iii) approve or

recommend, or propose to approve or recommend, any Company Takeover Proposal, (iv) approve or recommend, or propose to approve or recommend, or execute or enter into, any letter of intent, agreement in principle, memorandum of understanding, merger agreement, asset or share purchase or share exchange agreement, option agreement or other similar agreement related to any Company Takeover Proposal (an "Acquisition Agreement"), (v) enter into any agreement or agreement in principle requiring the Company to abandon, terminate or fail to consummate the transactions contemplated hereby or breach its obligations hereunder, or (vi) propose or agree to do any of the foregoing. The Company shall, and shall cause its Representatives to, immediately cease and cause to be terminated all existing discussions or negotiations with any Person conducted heretofore with respect to any Company Takeover Proposal, or any inquiry or proposal that may reasonably be expected to result in a Company Takeover Proposal, request the prompt return or destruction of all confidential information previously furnished and immediately terminate all physical and electronic data room access previously granted to any such Person or its Representatives.

33.     Further, the Company must promptly advise Virtu of any proposals or inquiries received from other parties.  Section 7.4(f) of the Merger Agreement states:

> (f) In addition to the foregoing obligations of the Company set forth in this Section 7.4, the Company shall within 24 hours of the receipt thereof, advise Parent orally of any Company Takeover Proposal, the material terms and conditions of any such Company Takeover Proposal (including any changes thereto) and the identity of the Person making any such Company Takeover Proposal. The Company shall (x) keep Parent informed in all material respects  and on a reasonably current basis (and in no event later than 24 hours from the occurrence or existence of any material event, fact or circumstance) of the status and details (including any material change to the terms thereof) of any Company Takeover Proposal, and (y) provide to Parent as soon as practicable after receipt or delivery thereof copies of all correspondence and other written material exchanged between the Company or any of its Subsidiaries and any Person that describes any of the terms or conditions of any Takeover Proposal.

34.     Moreover, the Merger Agreement contains a highly restrictive "fiduciary out" provision permitting the Board to withdraw its approval of the Proposed Transaction under extremely limited circumstances, and grants Virtu a "matching right" with respect to any "Superior Company Proposal" made to the Company. Sections 7.4(d) and (e) of the Merger Agreement provide:

(d) Notwithstanding the foregoing provisions, the Company Board may, prior to (but not after) the adoption of this Agreement by the holders of shares of Company Class A Common Stock in accordance with Section 251 of the DGCL, make a Company Adverse Recommendation Change if (x) in response to an unsolicited bona fide written Company Takeover Proposal, the Company Board determines (after consultation with its outside legal and, with regard to financial matters, its financial advisors) that such unsolicited bona fide written Company Takeover Proposal constitutes a Superior Company Proposal and following consultation with outside legal counsel, that failure to make a Company Adverse Recommendation Change is reasonably likely to violate its fiduciary duties to the stockholders of the Company under Applicable Law, or (y) other than in connection with a Company Takeover Proposal, an event, fact, circumstance, development or occurrence that affects the business, assets or operations of the Company or its Subsidiaries that is unknown to the Company Board as of the date of this Agreement becomes known to the Company Board (an "Intervening Event") prior to the adoption of this Agreement by the holders of shares of Company Class A Common Stock in accordance with Section 251 of the DGCL and the Company Board has concluded in good faith, following consultation with its outside legal counsel, that failure to make a Company Adverse Recommendation Change is reasonably likely to violate its fiduciary duties to the stockholders of the Company under Applicable Law; provided, however, that the Company shall not be entitled to exercise its right to make a Company Adverse Recommendation Change until after the fifth (5th) Business Day (the "Recommendation Change Notice Period") following Parent's receipt of written notice (a "Company Notice of Recommendation Change") from the Company advising Parent that the Company Board intends to take such action, including the details of the Intervening Event or, in the case of a Superior Company Proposal, the terms and conditions of any Superior Company Proposal that is the basis of  the proposed action by the Company Board and the identity of the party making such Superior Company Proposal, and, if applicable, shall have contemporaneously provided a copy of all of the relevant proposed transaction agreements and any other documents provided by, or correspondence with, the party making such Superior Company Proposal, including the then-current form of the definitive agreements with respect to such Superior Company Proposal (it being understood and agreed that any amendment to any material term of such Superior Company Proposal or change to the material facts and circumstances relating to such Intervening Event shall require a new Company Notice of Recommendation Change and trigger a new Recommendation Change Notice Period). The Company Board may not make a Company Adverse Recommendation Change in respect of a Superior Company Proposal if any such Superior Company Proposal resulted from a breach by the Company of this Section 7.4.

(e) Notwithstanding the foregoing, in determining whether to make a Company Adverse Recommendation Change, the Company Board shall take into account any changes to the terms of this Agreement committed to in writing by Parent in response to a Company Notice of Recommendation Change or otherwise; provided, that the Company shall, and shall use its reasonable best efforts to cause its financial

and legal advisors to, during the Recommendation Change Notice Period and prior to any Company Adverse Recommendation Change, negotiate with Parent in good faith (to the extent Parent also seeks to negotiate) to make such adjustments in the terms and conditions of this Agreement so that (i) in the event of a Company Notice of Recommendation Change in respect of a Superior Company Proposal, this Agreement results in a transaction that is no less  favorable to the stockholders of the Company than any Company Takeover Proposal that would be deemed to constitute a Superior Company Proposal in the absence of such adjustments or (ii) in the event of a Company Notice of Recommendation change in respect of an Intervening Event, the Company Board would no longer be required to make a Company Adverse Recommendation Change in order not to be reasonably likely to violate its fiduciary duties to the stockholders of the Company under Applicable Law, and, in the event Parent agrees to make such adjustments to the Agreement in either case of clause (i) or (ii) above, as applicable, no Company Adverse Recommendation Change shall be made.

35.    Further locking up control of the Company in favor of Virtu, the Merger Agreement provides for a "termination fee" of $45 million, payable by the Company to Virtu if the Individual Defendants cause the Company to terminate the Merger Agreement.

36.    By agreeing to all of the deal protection devices, the Individual Defendants have locked up the Proposed Transaction and have precluded other bidders from making successful competing offers for the Company.

37.    Additionally, Jefferies LLC ("Jefferies"), the beneficial owner of 24.5% of the Company's Class A common stock, entered into a voting agreement with Parent and Merger Sub pursuant to which Jefferies has agreed to vote its shares in favor of the Proposed Transaction. Accordingly, such shares are already locked up in favor of the merger.

38.    The consideration to be paid to plaintiff and the Class in the Proposed Transaction is inadequate.

39.    Among other things, the intrinsic value of the Company is materially in excess of the amount offered in the Proposed Transaction.

40.    Further, the merger consideration fails to adequately compensate the Company's

stockholders for the significant synergies resulting from the merger.

41.     The analyses performed by the Company's own financial advisor, Goldman Sachs & Co. LLC ("Goldman"), confirm the inadequacy of the merger consideration. For example, Goldman's *Illustrative Present Value of Future Share Price Analysis* yielded implied present values per share of Company common stock as high as $31.17. Goldman's *Illustrative Discounted Cash Flow Analysis* yielded implied present values per share of Company common stock as high as $27.09.

42.     Accordingly, the Proposed Transaction will deny Class members their right to share proportionately and equitably in the true value of the Company's valuable and profitable business, and future growth in profits and earnings.

43.     In addition to failing to conduct a fair and reasonable sales process, the Individual Defendants agreed to certain deal protection provisions in the Merger Agreement that operate conjunctively to deter other suitors from submitting a superior offer for KCG.

44.     First, the Merger Agreement contains a no solicitation provision that prohibits the Company or the Individual Defendants from taking any affirmative action to obtain a better deal for KCG shareholders.   The Merger Agreement generally states that the Company and the Individual Defendants shall not: (i) initiate, solicit, propose or knowingly encourage or knowingly facilitate any inquiry or the making of any proposal or offer that constitutes, or would reasonably be expected to lead to, an acquisition proposal; (ii) engage in, continue or otherwise participate in any discussions or negotiations relating to any acquisition proposal; or (iii) provide any non-public information to any person in connection with any acquisition proposal.

45.     Additionally, the Merger Agreement grants Virtu recurring and unlimited matching rights, which provides it with: (i) unfettered access to confidential, non-public information about

competing proposals from third parties which it can use to prepare a matching bid; and (ii) several days to negotiate with KCG, amend the terms of the Merger Agreement and make a counter-offer in the event a superior offer is received.

46.     The non-solicitation and matching rights provisions essentially ensure that a superior bidder will not emerge, as any potential suitor will undoubtedly be deterred from expending the time, cost, and effort of making a superior proposal while knowing that Virtu can easily foreclose a competing bid.  As a result, these provisions unreasonably favor Virtu, to the detriment of KCG's public shareholders.

47.     Lastly, the Merger Agreement provides that KCG must pay Virtu a termination fee of $42.4 million in the event the Company elects to terminate the Merger Agreement to pursue a superior proposal.  The termination fee provision further ensures that no competing offer will emerge, as any competing bidder would have to pay a naked premium for the right to provide KCG shareholders with a superior offer.

48.     Ultimately, these preclusive deal protection provisions restrain the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company.

49.     Given that the preclusive deal protection provisions in the Merger Agreement impede a superior bidder from emerging, it is imperative that KCG's shareholders receive all material information necessary for them to cast a fully informed vote at the shareholder meeting concerning the Proposed Merger.

**II.     The Materially Incomplete and Misleading Proxy**

50.     On March 3, 2017, Defendants caused the Proxy to be filed with the SEC in connection with the Proposed Merger.  The Proxy solicits the Company's shareholders to vote in favor of the Proposed Merger.  The Individual Defendants were obligated to carefully review the

Proxy before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions. However, the Proxy misrepresents and/or omits material information that is necessary for the Company's shareholders to make an informed decision concerning whether to vote in favor of the Proposed Merger, in violation of Sections 14(a) and 20(a) of the Exchange Act.

51. First, the Proxy Statement omits material information regarding KCG's financial projections and the financial analyses performed by the Company's financial advisor, Goldman, in support of its so-called fairness opinion.

52. With respect to KCG's financial projections, the Proxy Statement fails to disclose: (i) a reconciliation of all non-GAAP to GAAP metrics; (ii) unlevered free cash flow and its constituent line items, including, but not limited to, capital expenditures and changes in net working capital; (iii) interest; (iv) taxes; (v) depreciation and amortization; (vi) stock-based compensation expense; and(vii) net operating losses.

53. The Proxy fails to provide material information concerning the Company's financial projections. Specifically, the Proxy provides projections for non-GAAP (generally accepted accounting principles) metrics, including EBITDA and EBIT, but fails to provide line item projections for the metrics used to calculate these non-GAAP measures or otherwise reconcile the non-GAAP projections to the most comparable GAAP measures.

54. When a company discloses non-GAAP financial measures in a Proxy, the Company must also disclose all projections and information necessary to make the non-GAAP measures not misleading, and must provide a reconciliation (by schedule or other clearly understandable method), of the differences between the non-GAAP financial measure disclosed or released with

the most comparable financial measure or measures calculated and presented in accordance with GAAP. 17 C.F.R. § 244.100.

55. Indeed, the SEC has recently increased its scrutiny of the use of non-GAAP financial measures in communications with shareholders. The former SEC Chairwoman, Mary Jo White, recently stated that the frequent use by publicly traded companies of unique company-specific non-GAAP financial measures (as KCG has included in the Proxy here), implicates the centerpiece of the SEC's disclosures regime:

> In too many cases, the non-GAAP information, which is meant to supplement the GAAP information, has become the key message to investors, crowding out and effectively supplanting the GAAP presentation. Jim Schnurr, our Chief Accountant, Mark Kronforst, our Chief Accountant in the Division of Corporation Finance and I, along with other members of the staff, have spoken out frequently about our concerns to raise the awareness of boards, management and investors. And last month, the staff issued guidance addressing a number of troublesome practices *which can make non-GAAP disclosures misleading*: the lack of equal or greater prominence for GAAP measures; exclusion of normal, recurring cash operating expenses; individually tailored non-GAAP revenues; lack of consistency; cherry-picking; and the use of cash per share data. I strongly urge companies to carefully consider this guidance and revisit their approach to non-GAAP disclosures. I also urge again, as I did last December, that appropriate controls be considered and that audit committees carefully oversee their company's use of non-GAAP measures and disclosures.[1]

56. In recent months, the SEC has repeatedly emphasized that disclosure of non-GAAP projections can be inherently misleading, and has therefore heightened its scrutiny of the

---

[1] Mary Jo White, *Keynote Address, International Corporate Governance Network Annual Conference: Focusing the Lens of Disclosure to Set the Path Forward on Board Diversity, Non-GAAP, and Sustainability* (June 27, 2016), https://www.sec.gov/news/speech/chair-white-icgn-speech.html.

use of such projections.[2]  Indeed, on May 17, 2016, the SEC's Division of Corporation Finance released new and updated Compliance and Disclosure Interpretations ("C&DIs") on the use of non-GAAP financial measures that demonstrate the SEC's tightening policy.[3]  One of the new C&DIs regarding forward-looking information, such as financial projections, explicitly requires companies to provide any reconciling metrics that are available without unreasonable efforts.

57.    In order to make the projections included on page 45 of the Proxy materially complete and not misleading, Defendants must provide a reconciliation table of the non-GAAP measures (EBITDA and EBIT) to the most comparable GAAP measures.  Indeed, the Company routinely provides such a reconciliation table in its quarterly financial results releases, and it can therefore undoubtedly provide such a reconciliation table for the projections included in the Proxy without unreasonable efforts.

58.    At the very least, the Company must disclose the line item projections for the financial metrics that were used to calculated the non-GAAP measures EBITDA and EBIT, (*i.e.*, net income excluding net interest expense, income tax expense, depreciation and amortization). Such projections are necessary to make the non-GAAP EBITDA and EBIT projections included in the Proxy not misleading.

---

[2] *See, e.g.*, Nicolas Grabar and Sandra Flow, *Non-GAAP Financial Measures: The SEC's Evolving Views*, Harvard Law School Forum on Corporate Governance and Financial Regulation (June 24, 2016), https://corpgov.law.harvard.edu/2016/06/24/non-gaap-financial-measures-the-secs-evolving-views/; Gretchen Morgenson, *Fantasy Math Is Helping Companies Spin Losses Into Profits*, N.Y. Times, Apr. 22, 2016, http://www.nytimes.com/2016/04/24/business/fantasy-math-is-helping-companies-spin-losses-into-profits.html?_r=0.

[3] *Non-GAAP Financial Measures, Compliance & Disclosure Interpretations*, U.S. SECURITIES AND EXCHANGE COMMISSION (May 17, 2017), https://www.sec.gov/divisions/corpfin/guidance/nongaapinterp.htm.

59.     With respect to Goldman's *Illustrative Discounted Cash Flow Analysis*, the Proxy Statement fails to disclose: (i) the estimates of unlevered free cash flow for the Company for the last nine months of 2017 and for the years 2018 through 2021, and the corresponding definition and constituent line items; (ii) the range of illustrative terminal values for the Company; (iii) the terminal year estimate of the free cash flow to be generated by the Company; (iv) the amount of the Company's estimated net debt as of March 31, 2017 as provided by Company management; (v) the number of fully diluted outstanding shares of the Company as provided by Company management; (vi) Goldman's basis for applying perpetuity growth rates ranging from (2.0)% to 2.0%; and (vii) the inputs underlying the discount rates ranging from 9.0% to 11.0%.

60.     With respect to Goldman's *Illustrative Present Value of Future Share Price Analysis*, the Proxy Statement fails to disclose: (i) Goldman's basis for applying price to two- year forward earnings per share multiples of 8.0x to 12.0x earnings per share of Company common stock estimates for each of the fiscal years 2019 to 2021; and (ii) the inputs underlying the discount rate of 12.2%.

61.     With respect to Goldman's *Selected Transactions Analysis*, the Proxy Statement fails to disclose the individual multiples and financial metrics for the transactions observed by Goldman.

62.     With respect to Goldman's *Selected Companies Analysis*, the Proxy Statement fails to disclose the individual multiples and financial metrics for the companies observed by Goldman.

63.     With respect to Goldman's *Present Value of Price/Book Multiple to RoE Regression Analysis*, the Proxy Statement fails to disclose the multiples observed by Goldman.

64.     With respect to Goldman's *Transaction Premia Analysis*, the Proxy Statement fails to disclose: (i) the acquisitions observed by Goldman; (ii) the transaction values for the acquisitions; and (iii) the premia represented by the prices per share paid in the transactions.

65.     The disclosure of projected financial information is material because it provides stockholders with a basis to project the future financial performance of a company, and allows stockholders to better understand the financial analyses performed by the company's financial advisor in support of its fairness opinion. Moreover, when a banker's endorsement of the fairness of a transaction is touted to stockholders, the valuation methods used to arrive at that opinion as well as the key inputs and range of ultimate values generated by those analyses must also be fairly disclosed.

66.     The omission of this material information renders the Proxy Statement false and misleading, including, *inter alia*, the following sections of the Proxy Statement: (i) "Background of the Merger"; (ii) "Reasons for the Merger; Recommendation of the Company Board of Directors"; (iii) "Unaudited Prospective Financial Information"; and (iv) "Opinion of Goldman Sachs & Co. LLC."

67.     Second, the Proxy Statement omits material information regarding potential conflicts of interest of the Company's officers and directors.

68.     Specifically, the Proxy Statement fails to disclose the timing and nature of all communications regarding future employment and/or directorship of KCG's officers and directors, including who participated in all such communications.

69.     Communications regarding post-transaction employment during the negotiation of the underlying transaction must be disclosed to stockholders. This information is necessary for stockholders to understand potential conflicts of interest of management and the Board, as that

information provides illumination concerning motivations that would prevent fiduciaries from acting solely in the best interests of the Company's stockholders.

70.     The omission of this material information renders the Proxy Statement false and misleading, including, *inter alia*, the following sections of the Proxy Statement: (i) "Background of the Merger"; (ii) "Reasons for the Merger; Recommendation of the Company Board of Directors"; and (iii) "Interests of Certain Persons in the Merger."

71.     Third, the Proxy Statement omits material information regarding potential conflicts of interest of Goldman.

72.     The Proxy Statement fails to disclose the amount of "certain fees" Goldman is entitled to receive under its engagement with KCG if the Proposed Transaction is not consummated.

73.     Additionally, the Proxy Statement provides:

> Goldman Sachs and its affiliates and employees, and funds or other entities in which they invest or with which they co-invest, may at any time purchase, sell, hold or vote long or short positions and investments in securities, derivatives, loans, commodities, currencies, credit default swaps and other financial instruments of the Company, Virtu, any of their respective affiliates and third parties, including Leucadia National Corporation, the parent of Jefferies, Temasek Holdings (Private) Limited, an affiliate of a significant shareholder of Virtu ("Temasek"), the Republic of Singapore and its agencies or instrumentalities (collectively, the "Republic of Singapore"), including the Singapore Minister for Finance, the sole shareholder of Temasek, North Island Holdings I, L.P. ("North Island"), which, together with certain of its affiliates, is providing equity  financing to Virtu in connection with the merger, GIC Private Limited ("GIC"), which is providing equity financing to North Island in connection with the  merger, the Public Sector Pension Investment Board ("PSP"), which is providing equity financing to North Island in connection with the merger, and any of their respective affiliates and portfolio companies, or any currency or commodity that may be involved in the merger for the accounts of Goldman Sachs and its  affiliates and employees and their customers.

However, the Proxy Statement fails to disclose Goldman's holdings in Virtu, Leucadia National Corporation, Temasek, the Republic of Singapore, North Island, GIC, PSP, and their affiliates.

74.     Full disclosure of investment banker compensation and all potential conflicts is required due to the central role played by investment banks in the evaluation, exploration, selection, and implementation of strategic alternatives.

75.     The omission of this material information renders the Proxy Statement false and misleading, including, *inter alia*, the following sections of the Proxy Statement: (i) "Background of the Merger"; (ii) "Reasons for the Merger; Recommendation of the Company Board of Directors"; and (iii) "Opinion of Goldman Sachs & Co. LLC."

76.     Fourth, the Proxy Statement omits material information regarding the background of the Proposed Transaction. The Company's stockholders are entitled to an accurate description of the process the directors used in coming to their decision to support the Proposed Transaction.

77.     For example, the Proxy Statement fails to disclose the nature of the discussions between Virtu and Jefferies in December 2016 and early 2017 regarding Virtu's potential acquisition of KCG, including the "ranges of prices per share at which Virtua might consider making a proposal to acquire the Company."

78.     The Proxy Statement fails to disclose whether the non-disclosure agreement entered into between KCG and "Party A" contained a "don't ask, don't waive" provision.

79.     The Proxy Statement further fails to disclose the nature of the "inquiries concerning acquisitions of certain assets or businesses of the Company."

80.     The omission of this material information renders the Proxy Statement false and misleading, including, *inter alia*, the following sections of the Proxy Statement: (i) "Background of the Merger"; and (ii) "Reasons for the Merger; Recommendation of the Company Board of Directors."

81.     In sum, the omission of the above-referenced information renders statements in the Proxy materially incomplete and misleading, in contravention of the Exchange Act.   Absent disclosure of the foregoing material information prior to the special shareholder meeting to vote on the Proposed Merger, Plaintiff and the other members of the Class will be unable to make a fully-informed decision regarding whether to vote in favor of the Proposed Merger, and they are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## COUNT I

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 and 17 C.F.R. § 244.100 Promulgated Thereunder)**

82.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

83.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title."  15 U.S.C. § 78n(a)(1).

84.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that Proxy communications with shareholders shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

85.     SEC Regulation G has two requirements: (1) a general disclosure requirement; and

(2) a reconciliation requirement.  The general disclosure requirement prohibits "mak[ing] public a non-GAAP financial measure that, taken together with the information accompanying that measure, contains an untrue statement of a material fact or *omits to state a material fact necessary in order to make the presentation of the non-GAAP financial measure…not misleading.*"  17 C.F.R. § 244.100(b).  The reconciliation requirement requires an issuer that chooses to disclose a non-GAAP measure to provide a presentation of the "most directly comparable" GAAP measure, and a reconciliation "by schedule or other clearly understandable method" of the non-GAAP measure to the "most directly comparable" GAAP measure.  17 C.F.R. § 244.100(a).  As set forth above, the Proxy omits information required by SEC Regulation G, 17 C.F.R. § 244.100.

86.     The omission of information from a proxy statement will violate Section 14(a) and Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

87.     Defendants have issued the Proxy with the intention of soliciting shareholder support for the Proposed Merger.  Each of the Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide critical information regarding, amongst other things: (i) financial projections for the Company; and (ii) the valuation analyses performed by Goldman; and (iii) a significant conflict of interest Goldman faced as a result of its sizeable holdings in Virtu.

88.     In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).  The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information

to shareholders although they could have done so without extraordinary effort.

89.     The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Proposed Merger; indeed, the Proxy states that Goldman reviewed and discussed its financial analyses with the Board, and further states that the Board considered both the financial analyses provided by Goldman as well as its fairness opinion and the assumptions made and matters considered in connection therewith.  Further, the Individual Defendants were privy to and had knowledge of the projections for the Company and knew or should have known of the conflicts faced by Goldman.

90.     The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading.  Indeed, the Individual Defendants were required to review Goldman's analyses in connection with their receipt of the fairness opinion, question Goldman as to its derivation of fairness, and be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

91.     The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy.  The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence.  The Individual Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully as the Company's directors.  Indeed, the Individual Defendants were intricately

involved in the process leading up to the signing of the Merger Agreement and the preparation of the Company's financial projections.

92.     KCG is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

93.     The misrepresentations and omissions in the Proxy are material to Plaintiff and the Class, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Merger.

94.     Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

**(Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)**

95.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

96.     The Individual Defendants acted as controlling persons of KCG within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of KCG, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

97.     Each of the Individual Defendants was provided with or had unlimited access to

copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

98.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same.  The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Merger.  They were thus directly involved in preparing this document.

99.     In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.  The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

100.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

101.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class will be irreparably harmed.

102.     Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate

and irreparable injury that Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.      Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

B.      Enjoining Defendants and all persons acting in concert with them from proceeding with the shareholder vote on the Proposed Merger or consummating the Proposed Merger, unless and until the Company discloses the material information discussed above which has been omitted from the Proxy;

C.      Directing the Defendants to account to Plaintiff and the Class for all damages sustained as a result of their wrongdoing;

D.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses;

E.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: May 23, 2017                                 Respectfully submitted,

**FARUQI & FARUQI, LLP**

*/s/ Nadeem Faruqi*
Nadeem Faruqi (NF-1184)
James M. Wilson, Jr. (JW-8569)
685 Third Avenue, 26th Fl.
New York, NY 10017
Telephone: (212) 983-9330
Facsimile: (212) 983-9331
Email: nfaruqi@faruqilaw.com
           jwilson@faruqilaw.com

**MONTEVERDE & ASSOCIATES PC**
Juan E. Monteverde (JM-8169)
The Empire State Building
350 Fifth Avenue, Suite 4405
New York, NY 10118
Tel: (212) 971-1341
Fax: (212) 202-7880
jmonteverde@monteverdelaw.com

*Attorneys for Plaintiff*